IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO. SMP3791, | : : : | CIVIL ACTION |
| Plaintiff, | : : | |
| v. | : : | NO. 12-571 |
| WILLIAM CREAGH; 22ND STREET, LLC; GARY CREAGH, JR.; GARY CREAGH, SR., | : : : : | |
| Defendants. | : | |

DuBois, J.                                                                                                                                                                                                                                      June 25, 2013

**M E M O R A N D U M**

**I.     INTRODUCTION**

This is an insurance case. Plaintiff, Certain Underwriters at Lloyd's London ("Lloyds" or plaintiff) seeks declaratory judgment that a claim for damage to an apartment owned by defendant, William Creagh, is not covered under the insurance policy issued by plaintiff to defendants William Creagh, 22nd Street, LLC, Gary Creagh, Jr. and Gary Creagh, Sr. (collectively "Creagh" or defendants). The claim arises out of the decomposition of a dead body in an apartment owned by defendants. Defendants filed counterclaims alleging that (1) the damages were covered under the policy, (2) that plaintiff acted in bad faith, and (3) plaintiff committed unfair trade practices under state law. Presently before the Court are cross motions for summary judgment. For the reasons that follow, the Court grants plaintiff's motions for summary judgment and denies defendants' motions for summary judgment. Judgment is entered in favor of Lloyd's and against defendants.

## II. BACKGROUND

This case arose when the owner of an apartment building, defendant William Creagh, discovered the dead body of one of his tenants, Arthur Doud. In August of 2011, Doud's body was found collapsed over a toilet in his second floor apartment bathroom. He had been dead for possibly as much as two weeks. Bodily fluids had seeped into the bathroom floor and had contaminated the first floor bathroom directly below. Biological material was also found in the kitchen and bedroom of Doud's apartment, and a powerful foul odor pervaded the unit.

Following the discovery of the dead body, Creagh called police to the apartment. Creagh testified that, upon arriving and investigating the scene, the police instructed him to clean up the apartment as soon as possible. He concluded that, with that instruction, he had no choice but to proceed with clean-up of the apartment. Creagh immediately retained a company, Aftermath, Inc., to sanitize and otherwise remediate the building. Creagh also engaged Evans Services, LLC to reconstruct areas of the building that were removed or damaged in the clean-up.

Defendants submitted an insurance claim to Lloyd's for the cost of remediation and reconstruction charged by Aftermath and Evans Services, eventually totaling approximately $180,000. A few days after submitting the claim, Creagh spoke by phone with Robert Thompson, the insurance adjuster employed by plaintiff to adjust defendants' claim. Creagh testified at his deposition that during the phone call Thompson told Creagh to submit the final bill for the remediation of the apartment and Thompson would take care of it. Creagh stated that he got the impression his claim was covered under the policy because of the overall positive tone of the conversation, and the lack of statements by Thompson that the policy might not cover the damage at issue.

Plaintiff now seeks declaratory judgment, arguing that under the policy it is not required

to indemnify defendants for property damage resulting from the decomposed body. Defendants counterclaimed to recover that damage. Defendants' counterclaims have three components: (1) a claim for compensatory damages, (2) a bad faith claim, and (3) a claim that plaintiff violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law.

There are two sets of summary judgment motions pending. Each party has submitted a motion and cross-motion for summary judgment in each set. Between all of the motions and cross-motions, each party has filed a motion for summary judgment on the declaratory judgment claim and the counterclaims.

Pursuant to the Scheduling Order dated May 2, 2012 and the letter of agreement from the parties dated May 16, 2012, the Court may decide genuine issues of material fact in resolving the declaratory judgment action by cross-motions. This agreement is subject to the proviso that, if the Court concludes there are any genuine issues of material fact, the Court must identify them and allow the parties to supplement the record with documentation or testimony. The Court identified one such possible issue of material fact in its Order dated February 19, 2013: whether bacteria were present in Arthur Doud's bodily fluids. The parties each submitted supplemental memoranda on this issue.

First the Court addresses the arguments relating to plaintiff's declaratory judgment claim. The Court then turns to the arguments relating to defendants' counterclaims.

### III. LEGAL STANDARD

In considering motions for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions,

conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant a motion for summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

**IV.    DISCUSSION**

"The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." Canal Ins. Co. v. Underwriters at Lloyd's London, 435 F.3d 431, 435-36 (3d Cir. 2006).

The insurance contract at issue in this case is an "all risks" policy, which covers all losses except for those resulting from causes specifically excluded. "In claims for breach of contract to indemnify under an 'all risks' policy, Pennsylvania places the initial burden on the insured to show that a loss within the policy's scope has occurred . . . . The burden then shifts to the insurer

4

to defend by showing that the loss falls within a specific policy exclusion." Cozza ex rel. Cozza v. State Farm Fire & Cas. Co., 440 F. App'x 73, 75 (3d Cir. 2011).

"The pertinent inquiry is not . . . whether [an exclusion's wording] is so broad that virtually any substance, including many useful and necessary products, could be said to come within its ambit. Rather, guided by the principle that ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts, we focus on the specific product at issue." Madison Const. Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 606-07 (1999).

The parties do not contest whether a loss occurred within the scope of the policy. Rather, plaintiff asserts that three separate policy exclusions preclude coverage in this case: (1) the microorganism exclusion, (2) the seepage exclusion, and (3) the pollutants exclusion. These exclusions are evaluated in turn.

1. Microorganism Exclusion

Plaintiff first argues that the policy's "Microorganism Exclusion" precludes coverage for the claimed damages in this case. This provision of the contract states in pertinent part that: "This Policy does not insure any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to: mold, mildew, fungus, spores or other microorganism of any type, nature, or description . . . . " (Exhibit D-1, at 39.)

Plaintiff claims that the damages which required remediation in this case resulted from contamination with Doud's bodily fluids, which in turn contained bacteria and other microorganisms. Accordingly, plaintiff argues that the Microorganism Exclusion applies and precludes coverage for such damages. Defendants, in response, argue that there is no direct evidence that there were any bacteria present in Doud's bodily fluids, and that consequently, the exclusion does not apply.

For the policy exclusion to apply in this case, plaintiff must produce evidence that bacteria or other microorganisms were present in Arthur Doud's bodily fluids, and that they caused the damages at issue.

A.  Evidence Presented

Plaintiff presented overwhelming evidence that there were bacteria present in the bodily fluids of Arthur Doud which caused the damages in this case. On this issue, plaintiff presented the report of Dr. Walter I. Hoffman, Board-Certified Forensic Pathologist, who stated that there was evidence of bacteria present in the body of Arthur Doud and in the fluids which caused the damage to the building. For instance, Hoffman notes that "[t]here was evidence of biologic gas formation due to colonic and lung bacteria . . . . the offensive gases of putrefecation (foul odor/rotten eggs) occurs when bowel bacteria create these gases . . . The abdomen was rounded indicating colonic bacterial gas formation." (Ex. D-7, at 3.) He went on to note that, "[n]atural bowel bacteria are the cause of postmortem decomposition and resultant bloody fluid purging, i.e., body fluids escaping from the body from natural openings. These natural bacteria get into the blood stream, decompose blood and turn the natural fluids into purged fluid, i.e. the accumulating natural bacteria follow the blood vessels and organs." (Id.) Finally, he added that, "[s]mall, fine maggots (fly larvae) were present in limited areas indicating flies were recently present. This did not impact on the bacterial gas formation and decomposition." (Id.)

Following the Court's notice of the existence of a genuine issue of material fact as to whether bacteria were present in Doud's bodily fluids, plaintiff submitted an additional affidavit from Dr. Hoffman. In that affidavit Dr. Hoffman stated: "I can verify unequivocally that bacteria were present in Arthur Doud's bodily fluids that contaminated the subject property . . . . Mr. Doud's body was located within a hot apartment in the middle of August. These conditions

6

would have increased or accelerated the bacterial growth in Mr. Doud's body and bodily fluids." (Affidavit, dated March 13, 2013, at 1-2.)

Defendant Creagh testified as to the foul odor caused by Arthur Doud's decomposing body, consistent with Dr. Hoffman's description of "the offensive gases of putrefecation" created by bacteria. (Ex. D-7, at 3.) It was Creagh's testimony that the apartment smelled "ungodly" when he discovered Doud's body and that he had been receiving medical treatment as a consequence of "extreme exposure" to "the smell" of the dead body. (Deposition of William Creagh at 98, 108.) As he described his experience: "I don't know what I inhaled. You know, like smelling that made me sick. You know, its like you can't get over – you keep re-living the smell. So it's just – it's a smell, but, you know, you're smelling it everywhere you go after that. I couldn't sleep. I'm thinking about, you know, what I had seen. I was under a prescription to help me sleep. I couldn't sleep. I could not sleep. I was like really spooked." (Id.)

Defendants presented no evidence supporting their contention that bacteria were not, in fact, present in Arthur Doud's bodily fluids. Defendants instead argue that because no direct tests were performed on the fluids found in the apartment, there is insufficient evidence that bacteria were present in Doud's bodily fluids.

The uncontroverted expert evidence, corroborated by Creagh's testimony regarding odor consistent with bacterial formation, establishes that bacteria were present in the bodily fluids of Arthur Doud, and the Court so finds. There is no genuine dispute of material fact on this aspect of the case.

B. Damage Caused by Bacteria

In their motion papers, defendants claim that "Creagh's Damage claim was caused by the presence of bodily fluids not a dead body in his apartment." (Resp. at 8.) Dr. Hoffman stated in

his report that bacteria cause the purging of bodily fluids through natural openings. (Ex. D-7, at 3.) In this case, such purging resulted in the apartment becoming contaminated with Doud's bodily fluids and the bacteria in those fluids. Thus, the Court finds that the bacteria in Arthur Doud's bodily fluids caused the damages in this case, and that there is no genuine dispute of material fact on this question.

      C.      Conclusion Regarding Bacteria

There is uncontroverted evidence that bacteria was present in Arthur Doud's bodily fluids and that it caused the damages at issue. Accordingly, coverage for the damages in this case is precluded by the Microorganism Exclusion, which bars claims for "any loss . . . arising out of or relating to mold, mildew, fungus, spores or other microorganism of any type . . . ." (Exhibit D-1, at 39.)

      2.      Seepage and/or Pollution and/or Contamination Exclusion

Plaintiff next argues that the damages in this case are also excluded from coverage pursuant to the "Seepage and/or Pollution and/or Contamination Exclusion." That provision of the policy states in part: "[T]his Certificate does not insure: (a) any loss, damage, cost or expense, or (b) any increase in insured loss, damage cost or expense . . . which arises from any kind of seepage or any kind of pollution and/or contamination . . . ." (D-1, at 42.) This provision excludes coverage for losses caused by seepage of, <u>inter alia</u>, "any substance designated or defined as toxic, dangerous, hazardous or deleterious to persons or the environment under any . . . Federal, State, Provincial, Municipal or other law, ordinance, or regulation . . . ." (<u>Id</u>.)

Plaintiff argues that the bodily fluids which damaged the building have been designated as hazardous materials under federal regulations, and damages caused by such fluids are thus not covered under the policy. Defendants do not directly address this exclusion but state that there is

8

no evidence that the bodily fluids posed a danger to human health.

For this exclusion to apply, plaintiff must present evidence that the bodily fluids caused damage by "seepage", "pollution," or "contamination," and that the fluids themselves are regulated as hazardous materials.

   A.   Seepage of the Fluids

Pennsylvania state courts have discussed the meaning of much of the language in this exclusion. For instance, in Madison Const. Co. v. Harleysville Mut. Ins. Co., the Pennsylvania Supreme Court noted in reference to a similar exclusion the definition of "seepage" as, "the process of seeping, that is, flow[ing] or pass[ing] slowly through fine pores or small openings." 557 Pa. 595, 609 (1999). The court emphasized that the "element of movement" was a necessary requirement to find that coverage for certain damages was precluded by the exclusion there. Id.

Dr. Hoffman states in his report that bacteria cause bodily fluids to be purged through natural openings in the body. (Ex. D-7, at 3.) Further, there is evidence that the fluids flowed across Doud's apartment into different rooms, and into the bathroom on the first floor below. (Deposition of Charles Anderson, at 67, 83.) The Court thus concludes that the claimed damages were caused by "seepage" of the bodily fluids.

   B.   Regulation of the Fluids

The bodily fluids in this case are subject to federal regulations issued by the Occupational Safety and Health Administration ("OSHA"). Specifically, in a subpart titled "Toxic and Hazardous Substances," 29 C.F.R. § 1910.1030 lists "Other Potentially Infectious Materials." These materials include, "any body fluid that is visibly contaminated with blood, and all body fluids in situations where it is difficult or impossible to differentiate between body fluids . . . ." 29 C.F.R. § 1910.1030(b)(1). The regulations further state that "[u]niversal precautions shall be

observed to prevent contact with blood or other potentially infectious materials. Under circumstances in which differentiation between body fluid types is difficult or impossible, all body fluids shall be considered potentially infectious materials." 29 C.F.R. § 1910.1030(d)(1). Finally, "regulated waste" is defined as including "potentially infectious materials," such as the bodily fluids noted above, and such waste must be disposed of according to specific regulations. 29 C.F.R. § 1910.1030(d)(4)(iii)(B).

In his deposition, former Aftermath employee Charles Anderson stated that he could not determine what was in the bodily fluids in this case, and noted, "so that's why we just refer to it as biological material . . . . I mean we have no way of testing what's in it and what's not in it." (Dep. at 49-50.) He described in detail the initial remediation procedures, which involve the wearing of full-body protective suits with respirators and removing the waste and placing it in biohazardous waste boxes. (Id. at 19.) Next, the process requires wiping down the room with chemicals and towels, which are then also placed in biohazardous waste boxes. (Id. at 50, 53.) Notably, Aftermath advertises its compliance with the above-noted OSHA regulations. (Resp., Ex. D, at 2.)

The Court concludes that the bodily fluids of Arthur Doud are categorized as hazardous or dangerous materials pursuant to federal regulations and were treated as such by Aftermath.

        C.        Conclusion Regarding Seepage of Regulated Bodily Fluids

The Court concludes that there was "seepage" of the bodily fluids involved in this case, and the fluids themselves were "designated or defined as toxic, dangerous, hazardous or deleterious to persons . . . under . . . Federal . . . law." (D-1, at 42); see Madison Const. Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 607 (Pa. 1999) (noting government classification of chemicals as hazardous in support of exclusion); Matcon Diamond, Inc. v. Penn Nat. Ins. Co.,

10

815 A.2d 1109, 1114 (Pa. Super. Ct. 2003) (noting status of gas as a "regulated pollutant" in support of exclusion). Thus, coverage for the damage caused by the fluids is precluded by the "Seepage and/or Pollution and/or Contamination Exclusion." As previously stated, coverage is also precluded by the Microorganism Exclusion. Accordingly, the Court grants plaintiff's motion for summary judgment on plaintiff's declaratory judgment claim.

3. Pollutants Exclusion

Plaintiff finally argues that a third exclusion, the "Pollutants Exclusion," bars coverage for the claim here. The "Pollutants Exclusion" states that:

> "We will not pay for loss or damage caused by or resulting from any of the following: Discharge, dispersal, seepage, migration, release or escape of 'pollutants' unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the 'specified causes of loss.'" (D-1, at 9.) "Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed. (Id. at 101).

While this type of exclusion has been frequently litigated, courts remain split over whether "pollutants," as defined above, encompass organic materials such as bacteria. Compare Travelers Prop. Cas. Co. of Am. v. Chubb Custom Ins. Co., 864 F. Supp. 2d 301, 316 (E.D. Pa. 2012) (holding that odor from pig excrement was "pollutant" as defined under exclusion) with Motorists Mut. Ins. Co. v. Hardinger, 131 F. App'x 823, 827 (3d Cir. 2005) (Ambro, J. concurring) (stating his belief that "living, organic irritants or contaminants . . . defy description under the policy as . . . pollutants"). Because the Court has already concluded that coverage in this case is precluded by the Microorganism Exclusion and the Seepage Exclusion, the Court declines to address the question whether coverage is also barred pursuant to the Pollutants Exclusion.

4. Defendants' Counterclaims

Defendants filed three separate counterclaims for: (1) compensatory damages, (2) bad faith, and (3) violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law. None of the counterclaims are meritorious. They are addressed in turn.

A. <u>Compensatory Damages</u>

Count One of defendants' counterclaim appears first to assert a claim based on promissory estoppel. Count One states that Thompson, the claims adjuster for Underwriters, told Creagh that his claim was covered under the policy, to proceed to remediate the damage involved in the claim, and to hire the appropriate companies to such remediation. The counterclaim goes on to state that Creagh, acting and relying on the communication from Thompson, engaged Aftermath, Inc. to remediate the loss and damage involved. Finally, the counterclaim asserts that Creagh relied on Thompson's communication to engage Evans Services, LLC to remediate the loss and damage. Defendants seek compensatory damages for the cost of this remediation based on this evidence.

In their briefing, defendants did not make any argument regarding estopppel, stating that their Motion for Partial Summary Judgment "does not address [the] argument of estoppel against plaintiffs because their adjuster told him to proceed with the repairs to his property. The issues raised by that argument will be considered if the Court denies this motion." (Mot. at 2, n.1.) In later briefing, defendants mention the alleged representations by Thompson to Creagh only in determining whether plaintiff had an opportunity to inspect the apartment and test for bacteria in Doud's bodily fluids. (Def. Resp. to Pl. Cross-Motion, at 11; Def. Supp. at 4.) Even though plaintiff argued at length against a finding of estoppel in this case, defendants did not respond on this issue. (<u>See</u> Pl. Mot. for Summary Judgment, at 6.)

The Court concludes that defendants' failure to include an argument on the estoppel issue in any of their motion papers "constitutes abandonment" of that claim. See Seals v. City of Lancaster, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008); see also Harris v. Harley-Davidson Motor Co. Operations, Inc., 2011 WL 6003191, at *9 (M.D. Pa. Sept. 28, 2011) ("Inasmuch as plaintiff does not address this claim on summary judgment, defendant's motion thereon is considered unopposed.") Accordingly, plaintiff's motion for summary judgment is granted as to that part of Count One of defendants' counterclaims which asserts a claim of estoppel.

Assuming arguendo that this claim was not considered waived, the Court would still grant plaintiff's motion for summary judgment on this issue. "In order to maintain an action in promissory estoppel, the aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000). "These factors are strictly enforced to guard against the loose application of promissory estoppel." Peluso v. Kistner, 970 A.2d 530, 533 (Pa. Commw. Ct. 2009).

In his deposition, Creagh stated that after he discovered the decomposing body in his building he called the police. According to Creagh, once the police arrived at the scene they told him that he had to get a professional service to come out and clean up the apartment. (Deposition of William Creagh, at 71-72.) He was told by the police that he had to remediate the apartment as soon as possible, and "no way was there a choice" as to whether to remediate or not. (Id.) As a consequence, Creagh engaged Aftermath soon after his discussion with the police.

Specifically, Creagh stated that he spoke with Robert Thompson, Underwriter's adjuster, by phone "a few days," "maybe a week" after submitting his insurance claim. (Id. at 105.)

13

Creagh admitted that by the time he spoke with Thompson, he had already "lined up" Aftermath, Inc. to perform remediation work. (Id. at 107.) Creagh also stated that the reconstruction company, Evans Services, was retained by his adjuster Gary Blackmon. (Id. at 139.) At his deposition, Blackmon testified that he first engaged a "building estimator" from Evans Services shortly after the apartment damage was discovered, in early September of 2011. (Deposition of Gary Blackmon, at 51.)

Creagh testified that he was under the impression that there was coverage for his claim because Thompson told Creagh to submit the bill for the remediation when it was completed, and because the phone conversation didn't have a "negative tone," implying that the loss was covered. (Deposition of William Creagh, at 108.) Later in his deposition Creagh directly asserted that Thompson said that the claim would be covered, but explained that assertion by referencing the impression he got from the phone conversation with Thompson. (Id. at 127-32.)

Viewing the facts in the light most favorable to Creagh, even if Thompson told him in some fashion that his claim would be covered, Creagh's promissory estoppel argument fails because he cannot show that he took action in reliance on such a representation.

First, Creagh's own testimony establishes that he retained Aftermath, Inc. prior to his conversation with Thompson. Second, Creagh testified that that the police informed him that there was no choice as to whether or not to clean up the apartment. Third, Creagh does not state in his testimony that his conversation with Thompson caused him to engage Aftermath or Evans Services. Fourth, there is no evidence that Creagh engaged Aftermath or Evans Services in reliance on any promise or statement by Thompson. Thus, defendants' promissory estoppel claim fails.

14

Defendants additionally assert that they are able to state a prima facie case for compensatory damages by showing a loss under an all risk policy and the amount of the damage. The Court construes this as an argument that the policy covers the damages at issue. Because the Court has concluded that coverage for the damages is barred by the Microorganism and Seepage Exclusions, this argument is rejected.

In sum, there is no genuine dispute of material fact, and plaintiff is entitled to judgment as a matter of law as to defendants' compensatory damages claim. The Court thus grants that part of plaintiff's summary judgment motion covering Count One of defendants' counterclaims.

B.  Bad Faith

In Count Two of their counterclaims, defendants argue that plaintiff demonstrated bad faith in denying the claim at issue in violation of state law, 42 Pa. C.S.A § 8371. To recover under a claim of bad faith, an insured must show that the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim. Terletsky v. Prudential Property & Casualty Co., 437 Pa. Super. 108, 125 (Pa. Super. Ct. 1994).

Defendants claim that plaintiff demonstrated substantive and procedural bad faith by denying the insurance claim on the basis of the Microorganism Exclusion because of the presence of bacteria in the bodily fluids of Arthur Doud. The Court disagrees.

The Court has ruled that the Microorganism Exclusion precludes coverage for the damage caused by Doud's bodily fluids. The Court thus concludes that plaintiff's reliance on the Microorganism Exclusion to deny insurance coverage was not in bad faith, and there is no genuine dispute of material fact on this question. The Court thus grants that part of plaintiff's summary judgment motion covering Count Two of defendants' counterclaims.

### C. Unfair Trade Practices

Finally, defendants claim in Count Three of the counterclaims that in denying coverage for the damages at issue, plaintiff violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 et seq. "In Pennsylvania, only malfeasance, the improper performance of a contractual obligation, raises a cause of action under the Unfair Trade Practices and Consumer Protection Law . . . and an insurer's mere refusal to pay a claim which constitutes nonfeasance, the failure to perform a contractual duty, is not actionable." Horowitz v. Fed. Kemper Life Assur. Co., 57 F.3d 300, 307 (3d Cir. 1995). "[Malfeasance] requires affirmative conduct, such as an act of misrepresentation or deception, or a reckless mistake made." Suggs v. Nationwide Ins. Co., 2007 WL 3010524, at *3 (E.D. Pa. Oct. 16, 2007).

Defendants argue that plaintiff misled them by denying their insurance claim without any evidence that bacteria or other microorganisms were present in the bodily fluids of Doud. The Court has ruled that insurance coverage was properly denied pursuant to the Microorganism Exclusion. As such, there was nothing misleading in the denial of coverage on that ground. As there is no genuine dispute of material fact on this question, the Court grants that part of plaintiff's summary judgment motion covering Count Three of defendants' counterclaims.

### V. CONCLUSION

For the foregoing reasons, the Court grants plaintiff's summary judgment motions, and denies defendants' motions for summary judgment. Accordingly, judgment is entered in favor of plaintiff and against defendants on plaintiff's declaratory judgment claim and each of defendants' counterclaims. An appropriate order follows.